IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CULLEN W. BIRDINE, ) | Case No. 4:03CV3024 |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **MEMORANDUM** |
| ) | **AND ORDER** |
| RICK GRAY and TAMI BALES, ) | |
| now known as TAMI WADDEL, ) | |
| ) | |
| Defendants. ) | |

Pursuant to 42 U.S.C. § 1983, Cullen W. Birdine (Birdine) sued Rick Gray (Gray) and Tami Bales, now known as Tami Waddel (Waddel). Birdine claims that Gray and Waddel violated his constitutional rights as a pretrial detainee when, while serving as correctional officers at the Lancaster County, Nebraska, jail, they transported him naked from one cell to another, kept him naked, and used excessive force to restrain him.

Following a non-jury trial where Birdine appeared pro se (without counsel), I now issue my findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a). In general, I decide that Birdine's constitutional rights were not violated.

### *I. Background*

Based upon the testimony and documentary evidence presented at trial, I find the material facts to be these:

1.      At all times pertinent hereto Plaintiff was incarcerated at the Lancaster County Jail as a pretrial detainee.

2. At all times pertinent hereto defendant Rick Gray was employed as a Lieutenant by the Lancaster County Department of Corrections and acted within the scope and course of his employment and under color of state law.

3. At all times pertinent hereto defendant Tami Bales, now known as Tami Waddel, was employed as a correctional officer by the Lancaster County Department of Corrections and acted within the scope and course of her employment and under color of state law.

4. On August 22, 2000, Plaintiff was lodged in cell HAA24C in the A2 living unit of the jail. When officers reported for duty on the third shift (11 p.m. to 7 a.m.), they were informed by officers from the second shift (3 p.m. to 11 p.m.) that during second shift Plaintiff had repeatedly covered the window in his cell with toilet paper and/or pillow cases. Such conduct was prohibited by facility rules and regulations and staff had informed Plaintiff of that fact on each of the occasions that the window was covered. When an inmate covers his windows, the safety and security of the inmate and the facility are compromised because the correctional staff cannot monitor what the inmate is doing. Even then, an inmate in the Lancaster County Jail enjoys a certain degree of bodily privacy as a result of the construction of a four-foot wall adjacent to the toilet.

5. At approximately 11:40 p.m. on August 22, 2000, Lieutenant Gray, who was the shift supervisor for third shift, was informed that Plaintiff had again covered the window in his cell, using his towels, and that he was refusing officers' directions to remove the towels. In response to that information, Lieutenant Gray decided to move Plaintiff from his cell in the A2 living unit to a cell in the holding area of the jail so that staff could supervise him on a continuous basis. The holding cell was in the holding and booking area and it was immediately adjacent to where correctional officers were stationed. Thus, a correctional officer in the holding area could also

monitor the holding cell on a more or less continuous basis. On the evening in question, Waddel was assigned to that area.

6. Lieutenant Gray and Officers Steve Smith and Michael Gibson proceeded to Plaintiff's A-2 living unit cell. Lieutenant Gray opened the food hatch and looked into the cell, but could see nothing. He reached into the food hatch and removed the towels that were blocking the window in the cell door. At that time he could observe Plaintiff lying on his bunk in a pair of boxer shorts and shoes. He ordered Plaintiff to come to the door, but he refused. At that time the officers opened the door, proceeded into the cell, and directed Plaintiff to stand up. Lieutenant Gray placed handcuffs on Plaintiff and offered him an opportunity to put pants on, but he refused. As the officers began escorting Plaintiff out of his cell, he attempted to kick off his boxer shorts. Lieutenant Gray directed him not to do so, but he continued his efforts until he was successful. As a result, Plaintiff was naked except for shoes. Despite that fact, the officers proceeded with the transfer and ultimately placed Plaintiff in cell 11 in the holding area of the jail. Birdine was moved to the holding area of the jail via a secure elevator. When he was naked, there is no credible evidence that he was exposed to other inmates, other guards, or civilians during the transportation. If he was exposed, the exposure was fleeting.

7. Upon reaching cell 11 in the holding area, Lieutenant Gray removed Plaintiff's shoes and took them to the adjacent booking desk to secure them. As he was doing that, the remaining officers began removing the handcuffs from Plaintiff.[1] As the officers tried to remove the handcuffs, Birdine began physically resisting

---

[1] Because handcuffs can reduce a person's circulation if left on too long, the jail policy is to remove handcuffs as soon as possible after an inmate has been placed into a cell.

them.[2] In order to gain control of the plaintiff, the officers wrestled Birdine to the floor, where he continued to struggle. Lieutenant Gray reentered the cell and instructed the plaintiff to quit resisting. When he refused, Lieutenant Gray applied a hand-held electronic restraining device[3] to Plaintiff's back. That enabled the officers to gain some control of the plaintiff's arms and legs. However, he continued to struggle. At that time Officer Waddel, who was stationed in the adjacent booking area and who had heard the struggle, entered the cell and again instructed the plaintiff to quit resisting the officers. Again he refused, and Officer Waddel applied another electronic restraining device to Plaintiff's shoulder and upper back area and possibly to his legs. At that time, Birdine complied with the commands to quit resisting and the officers successfully removed the cuffs and safely exited the cell.

8. Both Gray and Waddel have received training[4] about the proper use of force and, in particular, about the use of "stun" devices. In fact, Gray is an instructor who teaches other correctional officers how to properly use these devices. Gray has been "shocked" numerous times both as a teacher and a trainee so that he could experience and explain what it felt like to be the recipient of this type of force. Waddel, too, has been "shocked" as a part of her training. According to Gray, whom

---

[2]The evidence revealed that one of the most dangerous times for a correctional officer is when an inmate is being handcuffed or being released from handcuffs. During those times, the correctional officer's attention is drawn to the handcuffs and not the inmate. As a result, the officer is especially at risk for being struck by the inmate's hands, elbows, arms, or shoulders. The handcuffs can even be used by the inmate as a weapon to swing at the officer.

[3]See Exhibit 14 for a photo of the device. See Exhibit 13 at unnumbered pages 8-11 for the characteristics of this device.

[4] See Exhibit 11 for the policy on use of force. See Exhibit 12 for policies and procedures for use of electronic restraints. See Exhibit 13 for a training and lesson plan regarding the use of these type of "stun" devices.

I believe,[5] the devices do not cause undue pain or burns. In fact, the devices do not cause any injury other than an occasional insignificant friction abrasion that fades away. According to the training materials, the use of these devices on Birdine's back and legs was safe and appropriate. Indeed, the use of these devices is preferable to other types of force such as "soft empty hand control" or "hard empty hand control." Simply put, it is normally safer to "shock" than to "strike" an inmate when the inmate engages in behavior similar to that exhibited by Birdine.

9. Almost immediately after the officers exited the cell in the holding area, the plaintiff began creating a disturbance by kicking and banging on the door, the walls, and the window. Plaintiff was also observed attempting to jump up and punch out the light fixture in the ceiling of the cell. This concerned Gray since an unlighted cell would pose a danger to Birdine and the correctional officers. Moreover, Birdine might harm himself if he destroyed the light fixture or he might be able to fashion a weapon from the remnants of the fixture. Lieutenant Gray opened the food hatch to the cell and instructed Plaintiff to place his hands through the hatch. He refused. Lieutenant Gray then instructed the plaintiff to lie on the floor in the cell. Plaintiff likewise refused that order. Lieutenant Gray concluded that the best available alternative to deal with the situation was to enter the cell and restrain the plaintiff. Accordingly, he obtained an electronic restraint shield,[6] ordered the cell door opened,

---

[5]I found Gray to be especially credible.

[6]See Exhibits 15 and 16 for photos of the device. The evidence demonstrated that, like a hand-held "stun gun," the electronic shield delivers a high-voltage low-amperage shock. (Ex. 13, at unnumbered pages 9-10.) It is safe and effective for inmates and correctional officers. The shield is typically used to gain access to, and secure control of, an inmate's room. It serves to protect the correctional officers from the blows of an inmate as the officers enter the room and the shield also provides control as a result of the electrical shock delivered to the inmate from the exterior of the shield. Since the shield emits both a visual and audible signal when activated and thus provides a warning to an inmate who faces the device, the shield sometimes

and proceeded into the cell toward the plaintiff with the shield activated. When Birdine attempted to punch Lieutenant Gray, the officer applied the activated shield to the plaintiff, forcing him to the floor. That enabled the other officers to place handcuffs and shackles on the plaintiff.

10. After Birdine was handcuffed and shackled, he was placed in a restraint chair.[7] After he was placed in the chair, the handcuffs and shackles were removed. The restraint chair is a padded, metal-framed chair with arm rests, a foot rest, and a seat and back rest that are tilted backwards slightly so that the subject is seated therein in a slightly reclining position. The chair is equipped with straps to secure the subject's shoulders, waist, arms, and legs so that the torso and extremities are immobilized. After the plaintiff was placed in the restraint chair, he continued to struggle, causing the chair to move around the cell. To avoid injury to the plaintiff, the staff secured the chair to a floor drain in the floor of the cell. After being placed in the chair, the staff continuously monitored the plaintiff's condition and his status, including the fit of the restraints. They also kept a written log of their observations and actions.[8] On a number of occasions, articles of clothing were placed in his lap, and on each occasion he knocked them off. A nurse also observed Birdine. After about four hours, and at about 4:30 a.m., the superintendent of the facility was called as required by jail policy and he approved the continued use of restraint chair. The staff also made periodic attempts to determine whether the plaintiff was sufficiently under control to be released from the restraint chair, but Birdine refused to state that he would be compliant. Ultimately, at approximately 9:50 a.m. on August 23, 2000,

---

causes inmates to cease resistance by merely displaying it. Unfortunately, Birdine did not elect to heed this warning.

[7]See Exhibit 17.

[8]See Exhibit 9.

Birdine ceased his resistance, was released from the chair, and provided with clothing.

11. The force employed by the defendants against Birdine was applied in a manner consistent with departmental policy[9] and did not cause any significant injuries to him.[10] While the use of the "stun" devices undoubtedly caused Birdine pain, that pain was not excessive, particularly when compared with other methods of control and the plaintiff's level of resistance.

## *II. Analysis*

Essentially, Birdine claims that his constitutional rights as a pretrial detainee were violated because: (1) he was transported naked from one cell to another and thereafter kept naked; (2) the officers used "stun guns" to restrain him; and (3) the officers kept him in a restraint chair for a long period of time. In evaluating these assertions, I will first briefly review the law generally as it pertains to the rights of pretrial detainees. After that, I review each of the three parts of Birdine's claim.

### *A. The Rights of Pretrial Detainees Regarding Punishment and Privacy*

For purposes of this suit, we should concentrate on two rights of pretrial detainees like Birdine. Because they are presumed to be innocent, pretrial detainees retain a conditional, constitutional right to be free from punishment and a conditional,

---

[9] See Exhibits 10, 11, and 12.

[10] Birdine claims that he was later taken to a hospital, but there was no corroboration of that fact and there is reason to doubt his testimony. In any event, Birdine did not claim, and there is no evidence, that Gray or Waddel caused him any significant injury. He does claim to have one remaining mark on his leg from use of the "stun" devices, but he admits that he "picked at" the spot. He further stated that at one time he had marks on his back, but they faded away.

-7-

constitutional right to privacy. See, e.g., Bell v. Wolfish, 441 U.S. 520, 535, 558-59 (1979).[11] While the "punishment" and "privacy" inquires are similar, they are not identical.

First, when determining whether a pretrial detainee's right to be free from punishment[12] has been violated, a court determines three things: (1) whether the action was imposed for the purpose of punishment or whether it was but an incident of some other legitimate governmental purpose, id. at 538; (2) assuming that the action was not intended as punishment and giving deference to the decisions of jail officials, whether the action was rationally related to a legitimate governmental purpose, id.; and (3) assuming that the action was not intended as punishment and assuming that it was relationally related to a legitimate governmental purpose, whether the action taken was excessive when compared with the governmental purpose for which the action was undertaken. Id.

Second, when the pretrial detainee's right to privacy[13] is implicated, the court determines the reasonableness of the jailors' actions; that is, one balances the needs of the institution against the invasion of privacy that results. Id. at 559. This requires a court to examine the scope of the intrusion, the justification for the action, and the place in which the action was conducted. Id.

---

[11]There have been numerous relevant decisions since Bell and many of those decisions provide important refinements. The discussion in the text is thus somewhat oversimplified. However, that discussion is an accurate recitation of the basic approach that I should follow and no more is necessary for this case.

[12]In Bell, the Court found that a pretrial detainee's right to be free from punishment flowed from the Fifth Amendment's Due Process Clause. Id. at 533-34.

[13]In Bell, the Court assumed that a privacy right for pretrial detainees could be found in the Fourth Amendment's guarantee against unreasonable searches and seizures. Id. at 558.

Finally, and whether considering the punishment or privacy theories, when evaluating the question of the legitimacy of the action taken by a jailor against a pretrial detainee, two things must be presumed. Initially, it is legitimate for the government to take actions necessary to insure the detainee's presence at trial. Id. at 539. Furthermore, it is legitimate for the government to take actions necessary to insure the proper management of the jail, particularly when it comes to the safety and security of the institution. Id. at 540.

### B. Moving Birdine When Naked and Allowing Him to Remain Naked

Because Birdine disrobed despite being told not to do so as the officers were transporting him to the holding cell, and because he refused to put his clothes back on in the face of repeated opportunities to do so, there was no constitutional violation in transporting him while naked and allowing him to remain naked in the holding cell.[14] Cf. Hill v. McKinley, 311 F.3d 899, 903-04 (8th Cir. 2002) (pretrial detainee's constitutional rights were not violated by the use of male guards in an otherwise justified transfer of an unruly and naked female; pretrial detainee's constitutional rights were violated when defendants allowed the female to remain completely exposed to male guards for a substantial period of time after the threat to security and safety had passed).

---

[14]To the extent Birdine also claims that he had a constitutional right to cover up the windows of the regular, single-inmate cell (prior to being moved to the holding cell) in order to insure his privacy while using the toilet, I reject that claim. In short, while he was in jail, Birdine had no constitutional right to a private room with private toilet facilities. Bell, 441 U.S. at 541-43 (the placement of two pretrial detainees in a cell with one uncovered toilet and requiring the two cell mates to share toilet facilities did not make out a constitutional violation). Still further, the jailors had obvious and legitimate "safety and security" reasons for needing to look into Birdine's cell through the window on his cell door. Finally, the sincerity of Birdine's claim is contradicted by the fact that there was a stub privacy wall that partially shielded Birdine while he used the toilet.

### *C. Using the "Stun Guns" on Birdine*

I am persuaded that the use of the "stun guns" on Birdine, a pretrial detainee, did not violate the Constitution. Compare, e.g., Jasper v. Thalacker, 999 F.2d 353, 354 (8th Cir. 1993) (prison guard's use of a stun gun in the face of a threat to another guard did not violate the Eighth Amendment even though the guards could have subdued the inmate without the device) with Hickey v. Reeder, 12 F.3d 754, 758-59 (8th Cir. 1993) (use of stun gun by jail officials against inmate to enforce an order to sweep his cell violated the inmate's right to be free from cruel and unusual punishment).[15]

I arrive at this conclusion because of the following facts:

(1) in each of the two instances in which force was employed against the plaintiff by use of the electronic devices, the force was used in direct response to conduct that clearly constituted an immediate threat to institutional safety, security, and efficiency; (2) in the first instance, Birdine posed a direct physical threat to the correctional officers, and in the second instance he posed a potential but real threat to himself and the security of the holding cell; (3) there is no evidence to support a finding that the use of the devices was intended to punish Birdine as opposed to achieving compliance with legitimate governmental objectives; (4) each time, before the devices were used, Birdine was told to stop his disruptive behavior, and he ignored the commands and continued to resist; (5) in neither case did use of the "stun guns" cause Birdine any significant injury; (6) in each instance, the devices were

---

[15]Obviously, these cases deal with persons who have been convicted of crimes. To that extent, they are not precisely on point since Birdine was a pretrial detainee. Nonetheless, they are sufficiently pertinent to provide a good guide.

employed by correctional officers trained in their use and in a manner consistent with published policies for use of force and use of these types of devices; and (7) in each instance, the force used was commensurate with the risk, not excessive, and safer than other readily available methods of control.

### D. Using the "Restraint Chair" for Birdine

Likewise, the use of the restraint chair, although certainly prolonged, did not violate Birdine's rights as a pretrial detainee. Cf. Guerra v. Drake, 371 F.3d 404, 405 (8th Cir. 2004) (affirming judgment in favor of pretrial detainee who was left in a restraint chair for prolonged periods of time on three occasions because specific policies regarding the chair's use had not been developed even though the pretrial detainee admittedly disobeyed orders and resisted the deputies).

I arrive at this conclusion because of the following facts:

(1) Birdine was placed in the restraint chair as a last resort and only after physically resisting the officers on two occasions; (2) Birdine was constantly monitored while in the restraint chair; (3) a log of the monitoring was maintained; (4) he was observed by a nurse while in the chair; (5) when the use of the chair exceeded four hours, and according to the policies of the jail, the superintendent of the facility was called (at 4:00 in the morning) to discuss its continued use and the superintendent approved the continued use of the device; (6) Birdine was given frequent opportunities to be released from the chair, but he declined those opportunities by refusing to agree to be compliant; (7) the chair itself is designed to be as comfortable as possible—the chair reclines, it is padded, and it has arm rests; (8) there is no evidence that the restraint chair was used to punish Birdine, but rather to restrain Birdine from

harming himself or damaging the holding cell; and (9) Birdine was not injured as a result of the use of the chair.

### *III. Conclusion*

Birdine's constitutional rights as a pretrial detainee were not violated. On the contrary, and although they acted in a "no-nonsense fashion," Gray and Waddel behaved professionally. Therefore,

IT IS ORDERED that judgment shall be entered by separate document as follows: Judgment is entered for Rick Gray and Tami Bales, now known as Tami Waddel, and against Cullen W. Birdine providing that the plaintiff shall take nothing and his complaint is dismissed with prejudice.

July 5, 2005.                                   BY THE COURT:

*s/Richard G. Kopf*
United States District Judge